## Anna Steeve, Defendant in Error, v. George D. Smith, Plaintiff in Error.

## Gen. No. 5,230.

1 DAMAGES—*when exemplary not awarded.* In an action for assault and battery exemplary damages should not be awarded if there was nothing of a malicious or premeditated character about the assault in question.

2. DAMAGES—*when expenses in seeking to effect cure cannot be awarded.* Where an amount paid or liability incurred for the services of a physician in seeking to effect a cure is sought to be recovered, such an allowance should not be made in the absence of proof that the charges of such physician were the usual and customary charges of a physician for such services.

Trespass. Error to the Circuit Court of Kane county; the Hon. MAZZINI SLUSSER, Judge, presiding. Heard in this court at the April term, 1909. Reversed and remanded. Opinion filed March 11, 1910.

JOHN A. RUSSELL and W. R. S. HUNTER, for plaintiff in error.

CHARLES B. HAZELHURST and IRWIN & EGAN, for defendant in error.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Mrs. Anna Steeve claims that George B. Smith struck her in the mouth on July 4, 1906. She brought this suit against him to recover damages therefor. He pleaded the general issue and *son assault demesne.* On a trial she had a verdict and a judgment for $2,000 and he has sued out a writ of error to review said judgment. He claims that there was no foundation in the proof of vindictive damages, and that the verdict was grossly excessive as compensation for the injuries inflicted. She claims that vindictive damages were warranted by the proof, and that the verdict was justified as compensation merely.

The parties are related by marriage, Smith's only daughter having married Mrs. Steeve's brother. Smith

owns a farm a few miles north of Elburn. Charles
A. Steeve, the husband of Mrs. Steeve, was a tenant
on Smith's farm, and lived in the lower part of the
house, and used a part of the barn, while Smith re-
served another part of the barn and the upper part
of the house, in which he and his wife lived. Mrs.
Steeve's proof is that on the afternoon of July 4th
at two or three o'clock, she was seated upon the porch
on the south side of the building with her two boys
and her little daughter and two hired men, named
Elmer and Elias Anderson, employed at the farm
across the road, who had taken dinner with her family
that day. The young folks were exploding fireworks.
Her husband was inside the house. Smith came
around the corner of the house from the barn, which
was north of the house, and asked the smaller boy
if he threw that stone, and the boy answered, "No."
Then he took hold of the older boy and asked him
if he threw that stone, and that boy said "No." Smith
threatened to beat the boy, or had his fist doubled
up as if to hit him; Mrs. Steeve went between them
and told Smith not to hit the boy, that he did not
throw any stones; Smith said: "Shut up or I will
knock you down," and struck her a hard blow in the
mouth, which loosened two teeth, bruised the outside
of her lip, cut the inner side of her lip and caused
her lip and nose to bleed; and for a long time there-
after her teeth were sore when she used them. She
staggered backwards, sat down in her son's lap,
screamed for her husband and he came out, and the
men had some kind of a scuffle upon the ground, which
resulted in Smith rising from the ground with his
face bleeding. Mrs. Steeve's version was sustained
by the testimony of herself, her two sons and the two
Andersons. Smith testified that the boys were in
his part of the barn, interfering with his carriage
and also with popcorn, sweet corn and fine seed corn,
which he had hanging up in his part of the barn, and
that he asked them to go away from his part of the

barn, and then he went back into a room in the barn
where he was at work; that soon a stone was thrown
into the place where he was working; that then
the boys went to the house; that very soon a large
stone was thrown and struck the edge of the door
and splintered it and grazed Smith's shoulder; that
he then went around to the front of the house and
put his hand on the shoulder of the oldest boy and
asked him if he threw that stone; and Mrs. Steeve
ran up between him and the boy, saying: "I will
fight you, I will fight you, I will fight you," and
struck him on the arm; that he did not double up
his fist but raised his hand, she being on the porch
and he on the ground, one and a half or two feet lower,
and pushed her back, and that in doing so, the tip
of his fore finger accidently struck her lip and forced
it against her teeth so that it drew a little blood;
that she immediately screamed for her husband, who
came out and jumped at him, and knocked him down
three times in succession, until Mrs. Steeve said:
"You have licked him enough; let him go; he don't
know what he is doing now;" that he did not strike
her husband at all; that her husband knocked Smith's
glasses into his eyes so that he could not see which way
he was going; and that when he finally got away from
Steeve he was out in the road two rods from the
porch.    There were no serious direct effects of the
blow struck by Smith.    One of Mrs. Steeve's wit-
nesses, a justice of the peace, testified that he saw
her in Elburn at four o'clock that afternoon.    She
milked four cows that evening, and one of her wit-
nesses, a constable, testified that he saw her in El-
burn at seven o'clock that evening.    Mrs. Steeve had
five witnesses to support her version, while Smith
had no eye witness but himself.    He is therefore
heavily overborne by the greater number of witnesses.
Nevertheless, his version of the transaction does not
stand wholly without confirmation.    While Mrs.
Steeve's sons and one of the Andersons testified that
their visit to the barn was before dinner and not after

dinner and that no words passed there with Smith, the other Anderson testified that they were at the barn for a long time after dinner and that Smith requested them to go away from his part of the barn. It is also plain from the testimony of several of Mrs. Steeve's witnesses that, although the porch was on the south side of the house and the barn was north of the house, they all knew that Smith was coming before he got there, and that at least one of the boys had been around the corner of the house and had seen him coming. While they all testified that Mrs. Steeve did not strike Smith, it was proved by way of impeachment that one of the Andersons told a witness soon after that Mrs. Steeve struck Smith, and, on motion for a new trial, the affidavit of Gray, the owner of the farm across the road and the employer of the Andersons, was filed, stating that after he got home at five o'clock that night, Elmer Anderson told him that one of the Steeve boys threw a rock at Smith and that Smith then ran up to the house and took hold of one of the Steeve boys and Mrs. Steeve then attacked Smith and that Smith pushed her away; and that Elmer did not state that Smith struck Mrs. Steeve or used any violence against her, except to push her away. Another circumstance tending to discredit the force of the proof offered by Mrs. Steeve was the presence of beer. Steeve had come home from Elburn late the night before, bringing a keg of beer for their fourth of July celebration. He went to Elburn in the forenoon of the fourth with his milk, and reached home about eleven o'clock A. M. He then slept till dinner time. They all testify that he and the two Andersons each had one glass of beer before dinner and one glass of beer at dinner, and that no more beer was taken, and that Mrs. Steeve and her boys had none. After dinner Steeve went to sleep again and slept till this controversy arose at two or three o'clock. The Steeve boys testify that no more of the beer was taken and that the rest was afterwards emptied out.

This story of the failure to drink the beer after getting it on purpose for a fourth of July celebration taxes the credulity of the court. It is much more probable that the excitement there was produced by the beer. Gray, in his affidavit, on motion for a new trial, states that when he reached home at five o'clock one of the Anderson men was decidedly under the influence of liquor and that the other one was drunk. As this trouble occurred about three o'clock and Mrs. Steeve's proof shows that she was in Elburn by four o'clock, the theory that the beer was the cause of the excitement and that the injury was apparently slight is rendered exceedingly probable.

Nothing that Mrs. Steeve did justified Smith in hitting her in the mouth, either with his open hand or clenched fist, and she has a cause of action for the injuries resulting therefrom unless she assaulted him first. But it is evident that there was nothing of a malicious or premeditated character about the assault by Smith. We are of opinion that the jury were not warranted in awarding vindictive damages, and that if there were no results of the blow, other than those already detailed, the damages awarded were grossly excessive. But Mrs. Steeve claims that the facts now to be stated made the verdict mere compensation. At the time of this blow she had been pregnant about three months. About midnight of the fourth her husband called a physician, who reached her about one or two o'clock on the morning of the fifth. He found her nervous and trembling, that she was flowing and complained of pains which indicated the probability of a miscarriage. He caused her to remain in bed and gave her medicine to quiet her pain. On July 11 she had a miscarriage, and was troubled almost continually thereafter till September following. The trial was in September, 1908, two years later. Shortly before the trial she was examined by several physicians who then found her in bad physical condition, which they denominated neurasthenia. They

all testified that the neurasthenia was likely to be permanent; that it might be due to the miscarriage, and that the miscarriage might be due to the blow given by Smith.  It developed that Mrs. Steeve had had a miscarriage several years before; and the physicians testified that, after one miscarriage another would be expected and would be liable to occur.  None of the physicians would testify that the miscarriage did result from the blow, or that it did not result from other causes.  On rebuttal it was shown that some months before this assault Mrs. Steeve had complained to a neighbor woman of her sufferings from excessive flowing, and that about a week before July 4, 1906, Mrs. Steeve told this woman that she was suffering from her old trouble, which the neighbor understood to refer to this excessive flowing; that the witness suggested to her that she was going to have another child and that Mrs. Steeve replied: "Oh no.  You know how I am, I will never have another baby any more." It was also shown that after the Steeve family left Smith's farm, and before the trial, Mrs. Steeve worked very hard upon the farm, and that, to save her sons from hard labor, she was accustomed to arise at four o'clock in the morning to milk the cows.  We are of opinion upon all this evidence that it is not reasonable to attribute either the miscarriage or the subsequent neurasthenia to this slight blow given by appellant; that the only reasonable conclusion is that the miscarriage was due to conditions existing before that time, and that the subsequent enfeebled physical condition of Mrs. Steeve just before the trial cannot be reasonably attributed to the blow.  We are therefore of opinion that the jury were not warranted in awarding $2,000 as compensation.

Mrs. Steeve testified that she paid her physician $100 during the time between July 4 and September 10, 1906, and that she had a nurse whom she paid $10.  There was no proof that these were the usual and customary charges of a physician for such serv-

ices, nor how long the nurse stayed, and therefore no foundation was laid for the allowance of anything on account of services of physician and nurse, under the principles discussed by us in Moore v. A. E. & C. Ry. Co., 150 Ill. App. 484. Yet in Mrs. Steeve's second instruction the jury were told that if they found for her, then in fixing the compensation to be awarded her, they should take into consideration the amount expended by her in endeavoring to be cured of such injuries.

The judgment is therefore reversed and the cause remanded for a new trial, because the damages are so grossly excessive as to indicate that the jury were influenced by passion and prejudice.

*Reversed and remanded.*

MR. JUSTICE WILLIS took no part.